HERRON, J.,
An issue raised in the administration of the estate of decedent Kenneth Sipos is whether he changed the beneficiary of his IRA retirement account by bequeathing that account to his brother in a will executed two years after decedent had complied with the terms of the policy by designating William Horton as the beneficiary on the IRA application form. Based on the facts presented, decedent failed to take all — or any — reasonable efforts to comply with the policy requirements. As a consequence, the beneficiary of the IRA account *261 remains William Horton, the person named on the IRA beneficiary designation/application form.
Background
Kenneth Sipos (“Kenneth”) died on July 28, 2012. In his May 26, 2011 will, he named his brother, David Sipos, executor. In April 2013, William Horton, a beneficiary under Kenneth’s will, filed a petition seeking an accounting by the executor. In response, David Sipos filed an account on January 21, 2014 covering the period July 28, 2012 through December 31, 2013. William Horton then filed objections, raising three issues. First, he challenged the inclusion of a prudential Savings Bank IRA retirement account as a probate asset since the decedent had designated William Horton as the beneficiary on the IRA beneficiary designation form on file with the IRA custodian. Second, Mr. Horton challenged the claim of Russell Force seeking compensation from Kenneth’s estate for a loan totaling $16,360.55. Finally, William Horton objected to the proposed sale of real property located at 119 N. 21st Street that had been specifically devised to him in Kenneth’s will. The parties submitted memoranda on the legal issues raised by the objections. An evidentiary hearing was subsequently held on November 12, 2014 on the remaining factual issues.
At the hearing, executor David Sipos provided some general background information about his brother. Kenneth had died at the age of 72. He had worked for the City of Philadelphia in the real estate department between 37 to 39 years until he retired at the age of 70.[1] Kenneth had never married and had no children, but years ago he had had a life partner, Russell Force. Their relationship lasted over 20 years but at the time of Kenneth’s death *262 they were just friends. Beyond their personal relationship, Russell Force and Kenneth had a business relationship as owners of a restaurant.[2]
Beginning in the summer of 2005, Kenneth moved in with William Horton. Mr. Horton testified that he had been Kenneth’s caretaker and that Kenneth lived with him for 6 to 7 years until a few weeks before his death.[3] In fact, Kenneth himself had characterized Mr. Horton as his caretaker to his physicians. Kenneth’s health was fragile; he had been diagnosed with stage 4 melanoma prior to coming to live with Mr. Horton. According to Mr. Horton, he cleaned, cooked and provided. He made sure Kenneth went to his doctors. He was there when Kenneth needed help.[4] There were times, however, when Mr. Horton was unable to care for Kenneth so that he had to go into a healthcare facility such as Watermark or Atria.[5] Russell Force testified that he loaned Kenneth money to pay for his stays at Watermark after surgery. In fact, he had Watermark send bills directly to him. He charged no interest for this loan because he and Kenneth had an understanding that these loans would be repaid. Mr. Force made it clear that he was not in a financial position to give this money away.[6] When asked about whether these payments by Russell Force had been gifts instead of loans, William Horton candidly acknowledged: “I have no way to know why Russell wrote checks.”[7]
Despite Kenneth’s physical ailments, chemotherapy and repeated surgeries, Mr. Horton testified that Kenneth’s mental health in the final year of his life between May 2011 *263 and July 2012 was “fine.” Kenneth kept busy, volunteering for various activities such as the Action AIDS thrift shop. He paid his own bills. He wrote checks. He went to the bank and engaged in financial transactions.[8]
Nearly two and a half years before his death, Kenneth Sipos executed a Prudential Savings Bank IRA form on October 14, 2009 that designated William Horton as primary beneficiary.[9] From the testimony, it became clear that Kenneth shared highly personal financial details with William Horton. Kenneth showed Mr. Horton the wills he executed in 2009 and 2011.[10] Mr. Horton therefore knew that he was to inherit Kenneth’s real property. He also was aware that Kenneth in both his 2009 and 2011 wills had designated his brother, David, to receive the Prudential IRA.[11] Finally, Mr. Horton knew that he had been designated as the beneficiary of this Prudential IRA in the beneficiary designation form; in fact, he had a copy of that document.[12]
A little more than a week before his death, Kenneth went down to Florida to stay with his brother, David. Mr. Horton accompanied him on this final trip.[13] About a month after Kenneth’s death, Mr. Horton cashed in the Prudential IRA policy and paid taxes on it.[14] David Sipos subsequently contacted the IRA plan administrator, who told him that William Horton was the designated beneficiary of the IRA and had already claimed the funds.[15] In a letter mailed September 12, 2012, David Sipos raised the following general question about Kenneth’s accounts *264 with the IRA Accounts department of Prudential Savings Bank:
This is a request by the estate of Kenneth A. Sipos to Prudential Savings Bank to provide paperwork showing monetary value of all accounts as of July 12, 2012 and as of date of distribution to beneficiary (prior to actual distribution) so that I may complete the Pennsylvania inheritance tax return.[16]
Donna Schaefer responded for prudential by listing the individual retirement accounts “registered in the name of Kenneth A. Sipos in trust for William Horton.” She noted that the “beneficiary would have the Inheritance Tax responsibility for the IRA accounts and would not be included in the estate.”[17] Significantly, David’s letter had made no contrary claim to the IRA accounts nor did it attach a copy of Kenneth Sipos’ will.
Legal Analysis
I. The Beneficiary of the Prudential IRA was not changed by Kenneth Sipos’ 2011 Will based on the Facts and Relevant Precedent
Under long-standing Pennsylvania precedent, as a matter of general principle a person who seeks to change the beneficiary of an insurance policy must follow the procedures set forth in the policy. Sproat v. Travelers’ Ins. Co., 289 Pa. 351, 354, 137 A. 621, 622 (Pa. 1927). There is, however, an exception to this general rule “where the policy holder has made every reasonable effort to effect a change of beneficiary, it will be given effect.” The motivating concern is to give effect to the insured’s intent to change a beneficiary where “he has *265 done all he could to comply with the terms of the policy.” Id. Applying this broad principle — and its exceptions — over the years has created a rich tapestry of nuanced precedent. In Sproat, for instance, the Pennsylvania Supreme Court ruled that the insured who requested a change in beneficiary form but neither filled it out nor returned it to the insurance company had not done all that he reasonably could have to change the beneficiary during the 6 month period between his request for a change of beneficiary form and his death.
In other cases, however, Pennsylvania courts have found valid changes in beneficiaries where the insured made reasonable efforts to change a beneficiary that diverged from some of the formal policy requirements for doing so. A seriously ill insured changed the beneficiary of her life insurance policy where she executed a change of beneficiary form and had it delivered to the insurance company but failed to have the policy likewise delivered as required under the change of beneficiary terms. In finding a successful change in beneficiary nonetheless, the court concluded that the insurance company could waive its own formalistic requirements for changing a beneficiary. Riley v. Wirth, 313 Pa. 362, 169 A.139 (Pa. 1933). See also Ruggieri v. Griffiths, 315 Pa. 455, 173 A. 396 (Pa. 1934)(beneficiary was changed where insured dictated a memorandum to insurance agent, signed an official change of beneficiary form to which the new beneficiaries named in the memorandum were added after her death). A change in beneficiary has also been recognized where the insured executed a change in beneficiary form that was lost by officials responsible for keeping track of it. Dale v. Philadelphia Bd. of Pensions and Retirement, 702 A.2d 1160 (Pa. Cmwlth. 1997, app. denied, 556 Pa. 696,727 A.2d 1123 (Pa. 1998). Finally, a change in beneficiary was recognized where the insured twice called his broker to *266 obtain a change of beneficiary form but failed to receive one prior to his death. In this case, the insured had called his broker the second time while hospitalized with terminal cancer only days before his death. Under these circumstances, the court found he had taken all reasonable steps to substantially comply with the terms of the policy for changing his beneficiary. Estate of Golas, 751 A.2d 229, 751 A.2d 229 (Pa. Super. 2000).
The precise issue of whether the beneficiary of a retirement IRA account may be changed by a will raises discrete, and more subtle, questions. In a case more directly on point, an insured failed to change the beneficiary of his life insurance policy by his will. Carruthers v. $21,000, 290 Pa. Super. 54, 434 A.2d 125 (Pa. Super. 1981). Both the trial and appellate court in Carruthers concluded that the beneficiaries of a life insurance policy were not changed by a will. The court did not, however, adopt a broad rationale that a will could never suffice to change beneficiaries designated according to the terms of the insurance policy. Instead, the Carruthers court adhered to prior precedent and examined the facts to determine if the decedent had made a reasonable effort to comply with the policy provisions. The insured in Carruthers had changed the beneficiaries of his life insurance policy twice by complying completely with the terms of the policy. After making these changes, he executed a holographic will to leave his insurance to his brother James. Both the trial court and the appellate court held that on these facts the decedent had not changed the beneficiary of his insurance policy with his will. Although the decedent had lived three and 1/2 months after executing his will, the insurer received no notice of this will until after the insured’s death. While noting that a change of beneficiary would be given effect even if received *267 after the insured’s death if the insured had made every reasonable attempt to comply with the policy, no such reasonable effort was found in Carruthers.
The issue of whether the beneficiary of annuities can be changed by a will was addressed by a split Pennsylvania Supreme Court in Alkhafaji v. TIAA CREF, 620 Pa. 530, 69 A.3d 219 (Pa. 2013). The effect of this split, according to the court, was to affirm the ruling of the Superior Court which had concluded that the attempted change in beneficiary had not been achieved. The exact parameter of this ruling is not clear, unfortunately, because the Superior Court opinion was unpublished, and the various Supreme Court justices did not agree as to precise issue addressed by the Superior Court. While one group of justices characterized the Superior Court as holding that a will could never effect a change in beneficiary of retirement annuities,[18] a different group of justices concluded the Superior Court had addressed the much narrower issue of whether on the facts before it, the insured had substantially complied with the terms of the policy in seeking to change the beneficiary.[19]
The analysis of Carruthers therefore sets out the clearest standard for this case. The terms of the beneficiary designation for the Prudential IRA account at issue are set forth in the accountant’s own exhibit, Ex A-4. The IRA application dated October 14, 2009 lists William Horton as the primary beneficiary. The provision for beneficiary designation states:
*268 BENEFICIARY DESIGNATION
Designate beneficiaries below. If the primary or contingent status is not indicated, the individual or entity will be considered a Primary beneficiary. After your death, your IRA assets will be distributed in equal shares (unless indicated otherwise) to the Primary beneficiaries who survive you. If no primary beneficiaries are living when you die, your IRA assets will be distributed in equal shares (unless otherwise indicated) to the contingent beneficiaries who survive you. You may revoke or change the beneficiary designation at any time by completing a new beneficiary designation form and providing it to the trustee/custodian.
Ex. A-4 (emphasis added).
No evidence was presented that Kenneth Sipos ever submitted a change of beneficiary form to prudential prior to his death. According to William Horton’s unrebutted testimony, Kenneth Sipos was mentally and physically fine in the year preceding his death. He managed his finances and was able to go out and about on his own.[20] Despite this, Kenneth never contacted prudential to change the beneficiary designation he made in October 2009. After Kenneth’s death, David Sipos, as executor, did not make a demand for the assets under the Prudential IRA by presenting a copy of the will naming him as the beneficiary of that IRA to Prudential. Instead, he sent a very judicious letter mailed September 12, 2012 that politely inquired about the monetary value of the Prudential accounts. The representative for Prudential replied by letter dated September 25, 2012 that the individual retirement accounts “registered in the name of Kenneth Sipos in trust for William Horton” had values of *269 $3,211.07, $5,844.57, $2,760.93 and $99,275.26. In fact, by that point William Horton had already claimed those assets, ultimately paying taxes on them. The procedural posture of this case also weighs against any finding that the IRA beneficiary had been changed. This issue arose only after William Horton sought an accounting by David Sipos. It was through Mr. Horton’s objections—and not an active pursuit by the executor — that the issue of the IRA beneficiary arose. Based on these facts, the beneficiary of Kenneth Sipos’s Prudential IRA was not changed by his will as no reasonable effort by Kenneth to comply with the terms of the policy was demonstrated.[21]
II. The Executor Properly Honored the Repayment of the Loan Russell Force made to the Decedent Prior to His Death
As a second objection, William Horton argues that the executor erred in admitting the claim of Russell Force in the amount of $16,360.55. As a general rule, when a fiduciary claims credit for a disbursement from an estate, the burden is on him to justify it with vouchers or other relevant proof. His mere testimony alone will not suffice. In re Strickler’s Estate, 354 Pa. 276, 277, 47 A.2d 134, 135 (Pa. 1946). In this case, the accountant and the claimant, Russell Force, have carefully documented his claim with copies of checks spanning the years from June 2006 through June 2011. See Ex. A-5. Two checks were made out to Kenneth Sipos; seven checks were made out to the *270 Watermark where Kenneth had resided for rehabilitation; one check was to Thomas Jefferson Hospital and another to Water Revenue Board. This documentary evidence was further buttressed by Russell Force’s highly credible testimony that he had made these checks as loans to Kenneth for his care and rehabilitation after surgery. More specifically, Mr. Force testified that he had the facility Watermark send the bills to him for Kenneth’s care. He stated convincingly that he did not ask for a promissory note because he trusted Kenneth. Nonetheless, it was clear he expected repayment because he was not in a financial position where he could just give money away.[22]
Based on this convincing record, the burden shifted to Mr. Horton to show either that there had not been a loan or that these payments had been a gift. Mr. Horton cites Hornyak v. Sell, 427 Pa. Super. 356, 629 A.2d 138 (Pa. Super. 1993) for the proposition that “[wjhen money is given from one party to another it is presumed to be a gift.”[23] That presumption recognized generally in Hornyak, however, arises where a parent furnishes the money to a child for the purchase of a house. Even in Hornyak it was not clear that such a presumption arose where the purchase money was supplied to a son-in-law. In the present case, in contrast, there was no familial relationship between Kenneth and Russell Force and at the time of the payments their relationship was that of good friends only.
In cases involving inter vivos gifts, the burden is initially on an alleged donee to prove a gift inter vivos by clear and convincing evidence. Once a prima facie case for a gift is set forth, a “a presumption of validity arises, and the burden shifts to the contestant to rebut this presumption with clear, precise and convincing evidence.” *271 Hera v. McCormick, 425 Pa. Super. 432, 439, 625 A.2d 682, 686 (Pa. Super. 1993). In this case, the alleged donee — Kenneth — is dead. The assertion of a gift is by the objector, William Horton. In his testimony, he conceded that he had no basis for asserting that Russell Force had given Kenneth the $16,360.50 as a gift. On the contrary, when asked “what makes you say that the payments by Russell Force were gifts and not loans,” Mr. Horton candidly admitted: “I have no way to know why Russell wrote checks.”[24] Even if the presumption of a valid gift was established, it was rebutted by the documentary evidence presented by the accountant as well as by Mr. Force’s highly credible testimony. For all these reasons, the accountant properly admitted Mr. Force’s claim.
III. The Accountant May Sell the Real Property located at 119 N. 21st Street after Filing an Amended Account Outlining the Estate’s Presently Outstanding Expenses
The accountant states that the real property located at 119 N. 21st Street, Philadelphia, specifically devised to William Horton, is the primary asset of the Sipos estate and that it must be sold to pay the decedent’s debts and the estate administration expenses. William Horton opposes this sale as premature. He suggests that the full extent of the debts and administrative expenses are still undetermined. Although he concedes that if there are legitimate estate debts remaining, the home may need to be sold, he also expressed a desire to retain it if possible.[25]
During the hearing, David Sipos outlined the remaining debts of the estate. He testified that he had loaned his personal money to pay estate debts and that he expected repayment. The exact amount of this debt *272 was still undetermined as of the hearing. Counsel for the accountant agreed that an amended account would need to be filed.[26] In light of this, the accountant shall file an amended account outlining the present outstanding debts of the estate. The objectant has also asserted that the value of the property is greater than estimated by the executor. Upon review of that amended account, and any objections to it, a determination will be made as to whether the real property devised to Mr. Horton must be sold. In the interim, the parties may be able to negotiate an agreement as to the necessity for selling the property.
According to the account Pennsylvania Transfer Inheritance Tax and Estate Tax was paid in the amount of $19,188.96 on April 12, 2013 and in the amount of $2,737.04 on June 24, 2013.
The account shows a balance of principal before distribution of $216,383.83 and a balance of income before distribution of $0 for a total of $216,383.83. In the rider to the statement of proposed distribution, the accountant requests an order directing that the proceeds of the decedent’s prudential IRA be paid over to David Sipos, which is denied for the reasons set forth in the audit memorandum. In addition, his request that this *273 court order the sale of the real estate located at 119 N. 21st Street, Philadelphia, to pay decedent’s unpaid debts and administrative debts is deferred pending the filing of an amended account within 20 days that sets forth the outstanding debts and expenses more precisely.

. 11/12/14 N.T. at 6 (David Sipos).

ÑÍ/2/14 N.T. at 17 (David Sipos); 11/12/14 N.T. at 45-47 (Force).

. 11/12/14 N.T. at 61 (Horton).

. 11/12/14 NT. at 60-61 (Horton).

. 11/12/14 N.T. at 68 (Horton).

. 1/12/14 N.T. at 48-51 (Force).

. 11/12/14 N.Y. at 70-71 (Horton).

Ñ1/12/14 N.T. at 62-63 (Horton).

 S&0 F,y A-4

. 11/12/14 N.T. at 73-76 (Horton).

. 11/12/14 N.T. at 74-75 (Horton).

. 11/12/14 N.T. at 76 (Horton).

. 11/12/14 N.T. at 72 (Horton).

. 11/12/14 N.T. at 59 (Horton).

. 11/12/14 N.T. at 19-20 (David Sipos).

. ex. A-4.

. Ex.A-4.

. Alkhafaji v. TIAA-CREF, 620 Pa. 530, 69 A.3d219 (Pa.2013(Justice Todd)(Justice Baer)(suggesting that wills could be used to change beneficiaries of a retirement annuity under the facts of this case).

. Alkhafaji v. TIAA-CREF, 620 Pa. 530, 69 A.3d 219 (Pa. 2013) (Justice Saylor)(Justice Castille)(Justice Eakin)(concluding the insured had not substantially complied with the terms of his policy). Justice Cas-tille and Eakin left open the question of whether the will could have changed the beneficiaries if it had been sent to the insurer prior to the insured’s death — but that had not occurred.

A1/24/14 N.T. at 62-63 (Horton).

. As an aside, because of the inherently different nature of an insurance contract and a testamentary will a more definitive ruling that a will cannot change the designation of a beneficiary of an IRA would avoid the potential mischief in analyzing surrounding facts to determine if the decedent made a reasonable effort to comply with the terms of the contract. Section 6108 of the PEF code clearly states that the designation of beneficiaries of insurance or employee death benefits is not testamentary. To entertain the possibility that such beneficiaries could be changed solely by a will could create serious confusion.

. 01/12/14 N.T. at 48-49 (Force).

. 4/30/14 Horton Memo of Law at 8.

. 7Í1/12/14N.T. at 70-71 (Horton).

. 4/30/14 Horton Memorandum of Law at 10.

. See 11/12/14 N.T. at 37-38 (Soloman). After hearing the testimony by David Sipos concerning the estate’s outstanding debts and expenses, questions arose as to the exact amount at issue:
The Court: After the account was filed additional expenses were paid?
Mr. Soloman: Correct.
The Court: And he expects to be repaid those expenses?
Mr. Soloman: Correct.
The Court: And I haven’t a clue what they are.
Mr. Soloman: Nor do 1 Your Honor, they are accumulating as we speak for every minute I am sitting her.
The Court: Well, do you expect to file an amended account?
Mr. Soloman: I expect at some point we will have to file an amended account, correct. It all hinges, as you know, Your Honor, upon the sale of the real estate. 11/12/14 N.T. at 37-38.